UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────

Nº 09 Civ. 5593 (RJS)

───────────────

MIG, INC., formerly known as
Metromedia International Group, Inc.,

Plaintiff,

VERSUS

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, L.L.P.,

Defendant.

───────────────

OPINION AND ORDER
March 29, 2010

───────────────

RICHARD J. SULLIVAN, District Judge:

Plaintiff MIG, Inc. brings this action against Defendant Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P. for legal malpractice and other tortious conduct in connection with the 1997 creation of a series of MIG, Inc. preferred stock. Now before the Court is Defendant's motion to dismiss the Complaint against it because all claims are either barred by the applicable statute of limitations or fail to state a claim upon which relief can be granted. For the reasons set forth below, Defendant's motion is granted.

I.   BACKGROUND

Plaintiff MIG, Inc. ("MIG") is a telecommunications company incorporated in Delaware, with its principal place of business in North Carolina and its primary operations in the Republic of Georgia. (First Amended Complaint ("FAC" or the "Complaint") ¶¶ 3, 10.) MIG was formerly known as Metromedia International Group, Inc. (*Id.* at 1.)

Defendant Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P. ("PW"), a New York limited liability partnership headquartered in New York (*Id.* ¶ 4), is a New York law firm with an extensive corporate practice. (*Id.* ¶¶ 5-6.)

A.  Facts[1]

This action arises out of a recent Delaware Chancery Court decision, which interpreted certain provisions of a 1997 certificate of designation contrary to the way both PW and MIG intended. That interpretation cost MIG roughly $140 million. MIG alleges that PW committed malpractice in drafting the certificate of designation.

1.  The Certificate of Designation

In 1997, PW drafted the "Certificate of Designation of 7.25% Cumulative Convertible Preferred Stock of Metromedia International Group, Inc." (the "COD"). (FAC ¶¶ 2, 18.) The COD, dated September 16, 1997, created a series of 4,140,000 shares of 7.25% cumulative convertible preferred stock (the "Preferred Stock"). (FAC Ex. 1 (the COD) at 1.) More importantly, the COD governed the rights of the holders of the Preferred Stock (the "Preferred Holders"). (FAC ¶ 2; COD at 1.) The COD acted as an amendment to MIG's certificate of incorporation. *See Elliot Assocs., L.P. v. Avatex Corp.*, 715 A.2d 843, 852 (Del. 1998).

Of the many provisions of the twenty-page COD, four are particularly relevant to this case. First, the Preferred Stock is cumulative, guaranteeing that the Preferred Holders will eventually receive all of their earned dividends, plus interest, before MIG can pay any dividends or make any distributions to common, junior, or *pari passu* stock. (COD §§ 2.1, 2.3.) Second, the COD contains a section governing "Conversion," or the right of Preferred Holders to redeem their Preferred Stock for common stock "at any time." (*Id.* § 8(a).) The formula for determining the number of common shares to which a Preferred Holder is entitled is as follows:

> [T]he product of the number of shares of Preferred Stock being so converted multiplied by the quotient of (i) the Liquidation Preference [$50] plus any Accumulated Dividends and any Accrued Dividends to and including the date of conversion divided by (ii) the Conversion Price (as defined below) then in effect . . . . The Conversion Price shall be $15.00 subject to adjustment as set forth in Section 8(c).

(*Id.* § 8(a).)

Third, section 8(b) of the COD provides, arguably, another right of compensation for Preferred Holders who choose to convert:

> When shares of Preferred Stock are converted pursuant to this Section 8, all Accumulated Dividends and all Accrued Dividends (whether or not declared or currently payable) on the Preferred Stock so converted to (and not including) the date of conversion, shall be immediately due and payable, at the Company's option, (i) in cash; (ii) in a number of fully paid and nonassessable shares of Common Stock equal to the quotient of (A) the amount of Accumulated Dividends and Accrued Dividends payable to the holders of Preferred Stock hereunder, divided by (B) the

---

[1]  The following facts are taken from the Complaint. The Court also considers any written instrument attached to the Complaint, statements or documents incorporated into the Complaint by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"), and documents upon which Plaintiff relied in bringing suit. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Market Value of the period ending on the date of conversion; or (iii) a combination thereof.

(*Id.* § 8(b).)  Fourth, section 8(g) provides:

In case of any capital reorganization or reclassification or other change of outstanding shares of Common Stock[,] . . . or in case of any consolidation or merger of the Company with or into another Person[,] . . . or in case of any sale or other disposition to another Person of all or substantially all of the assets of the Company . . . each share of Preferred Stock then outstanding shall, without the consent of any holder of Preferred Stock, become convertible only into the kind and amount of shares of stock or other securities . . . or property or cash receivable upon such Transaction by a holder of the number of shares of Common Stock into which such share of Preferred Stock could have been converted immediately prior to such Transaction after giving effect to any adjustment event.

(*Id.* § 8(g).)

### 2. PW and MIG's Relationship: 1997-2008

The Complaint details a long professional relationship between the two parties. It represents that "PW was retained to represent MIG on all aspects of its business and corporate transactions, which included without limitation, representing MIG concerning its preferred stock, the issuance thereof in 1997, and all related securities matters." (FAC ¶ 13.) In fact, "PW was retained to be . . . intimately involved with all facets of MIG's corporate finance structure, public securities, governance, transactions, employment and any and all other aspects of MIG that required or involved rendering all-encompassing corporate legal advice." (*Id.* ¶ 14.)

Plaintiff alleges that PW continued to represent it with regard to the 1997 Preferred Stock issue from 1997 until 2008. (*Id.* ¶ 21.)  For example, the Complaint alleges that PW "advised, reviewed, commented, edited and wrote" various SEC filings that concerned the Preferred Stock, such as the Company's 10Ks, 10KAs, 10Qs, 10QAs for that period.  (*Id.* ¶¶ 20-21.)

In 2002, PW again gave MIG targeted legal advice with regard to the Preferred Stock. Specifically, Plaintiff alleges that on February 26, 2002, PW gave a presentation to MIG's board that addressed continued dividend payments to the Preferred Holders. (FAC ¶ 21.)  Thereafter, in 2003, a PW partner, James Dubin, "was specifically involved in the legal aspects of MIG's decision to issue a press release concerning MIG's non-payment of the dividend to the Preferred Shareholders." (*Id.*)  At the same time, Dubin "advised MIG's board in connection with a proposed transaction . . . which would have triggered the COD's Change of Control provision." (*Id.*)  On November 3, 2003, PW issued a memorandum on the subject of retiring the Preferred Stock, where it discussed, among other things, an error in the computation of compounded interest on unpaid dividends. (*Id.*)[2]

On October 13, 2004, while advising MIG on a series of proposals for the "sale of the majority of MIG," PW issued a

---

[2] The Complaint indicates that the error was in the actual *computation* of dividends, rather than in the COD itself.  (FAC ¶ 21.)

3

memorandum informing the MIG Board of a potential problem with the COD. (FAC ¶ 21; Decl. of Paul C. Gluckow in Supp. of Def.'s Mot. to Dismiss or Stay ("Gluckow Supp.") Ex. B (Mem. from James M. Dubin & Jeffrey D. Marell to the Board of Directors of Metromedia International Group, Inc. (Oct. 13, 2004) (the "2004 Memo")).) The 2004 Memo informed MIG that an "inconsistency" or "ambiguity" in the COD could be read to provide the Preferred Holders with greater financial rights than either MIG or PW had intended. It explained:

> Section 8(a) of the Certificate of Designations of the Preferred Stock . . . provides that a holder of Preferred Stock has the right to convert the face value of his Preferred Stock, together with all accrued but unpaid dividends, into common stock of Metromedia (the "Common Stock") at any time. Section 8(b) of the Certificate of Designations states that when shares of Preferred Stock are converted, all accrued but unpaid dividends shall be immediately due and payable, at Metromedia's option, in cash or Common Stock or any combination thereof. When read in tandem, these provisions could prompt a holder of Preferred Stock to convert his Preferred Stock, including all accrued but unpaid dividends, into Common Stock pursuant to Section 8(a) and then to cite Section 8(b) and claim entitlement to additionally receive, cash, stock or any combination thereof in an amount equal to all accrued but unpaid dividends on the Preferred Stock so converted. *In effect, a successful claim of this type would allow a holder of Preferred Stock to be paid twice for the accrued but unpaid dividends on the Preferred Stock so converted.*

(*Id.* at 1 (emphasis added).)

The memorandum opined that such a "double-dip" would be "highly unusual" in a COD, noted that it would be inconsistent with the Preferred Stock prospectus, and offered an "Alternative Reading of the Certificate of Designations That Does Not Support a 'Double-Dip' Upon a Conversion." (*Id.*) Therefore, the memorandum argued that "we believe that there was no intent to create a right to be paid twice," and that "the better reading of the Certificate of Designations is to either disregard Section 8(b) entirely or interpret it to mean that Metromedia has the right to decide whether to pay the accrued but unpaid interest due upon a conversion in cash, Common Stock or any combination thereof." (*Id.* at 2.) "Nevertheless," the 2004 Memorandum concluded,

> there is a risk that a court could strictly construe the text of the Certificate of Designations and, based solely on a reading of what is contained in the "four corners" of the document, find that a holder of Preferred Stock that elects to convert his Preferred Stock is entitled to be paid twice for the accrued but unpaid dividends on the Preferred Stock so converted.

(*Id.*) The 2004 Memorandum further suggested means of addressing the inconsistency, such as amending the COD or asking the Preferred Holders to waive their rights under Section 8(b). (*Id.* at 3.)

PW was also involved in negotiations with the Preferred Holders regarding their

4

rights to place two members on the MIG board pursuant to section 6 of the COD. Subsequently, from 2005 through 2007, PW was involved in planning MIG's bankruptcy, negotiating with the Preferred Holders over a "voting lock-up" agreement, and discussing a potential sale of MIG to a consortium of investors and, later, to CaucusCom. (FAC ¶ 21.)

### 3.   The Merger and Appraisal

On August 27, 2007, CaucusCom Mergerco Corp., a wholly owned subsidiary of CaucusCom Ventures, L.P. ("CaucusCom"), merged with MIG, leaving MIG as the surviving entity. (FAC ¶ 27.) The transaction resulted in CaucusCom becoming the controlling shareholder of MIG and soon taking control of MIG's board of directors. *See In re Apppraisal of Metromedia Int'l Group, Inc. (Metromedia I)*, 971 A.2d 893, 898 (Del. Ch. 2009.). Soon after, two groups of Preferred Holders sued in Delaware Chancery Court seeking valuation of their stock. (FAC ¶ 27.)

On April 16, 2009, the Delaware Chancery Court concluded that the COD entitled preferred shareholders to "double-dip," or be paid twice for the accrued dividends. (FAC ¶¶ 28, 30.) *See Metromedia I*, 971 A.2d at 906-07 (Del. Ch. 2009.); *In re Appraisal of Metromedia Int'l Group, Inc. (Metromedia II)*, No. 3351-CC, 2009 WL 1509182, at *3 (Del. Ch. May 28, 2009). The Court found that, under Delaware law, the appraisal rights of preferred shareholders are governed by a certificate of designation or the certificate of incorporation and are interpreted according to traditional contract principles. *See Metromedia I*, 971 A.2d at 900. The Chancery Court held that section 8(g) of the COD controlled the rights of the Preferred Holders and mandated conversion pursuant to section 8(a) of the COD. *Id.* at 901-02. Applying section 8(a) to the Preferred Shares, the court concluded that section 8(a) yielded each Preferred Holder 10.038 shares of common stock. *See Metromedia II*, 2009 WL 1509182, at *1-2.[3] Thus, because the merger cashed out all common shares, section 8(g) entitled each Preferred Holder to $1.80 for each common share it was entitled to, or $18.07 total for each Preferred Share. *Id.* at *2.

The Chancery Court also found that section 8(a) was not the only "value-adding" provision that applied when section 8(g) was invoked. It concluded that section 8(b) was also applicable and that MIG was obligated to pay a separate cash payment equal to the accumulated dividends to the Preferred Holders. *Metromedia I*, 971 A.2d at 903. Therefore, the court ordered MIG to pay the Preferred Holders an *additional* $29.40 per share, representing the accumulated dividends. *Id.* at 907. Finally, the court awarded interest on the whole appraisal award. *Id.* at 908. With 4,140,000 shares outstanding, the incremental cost to MIG was approximately $121 million before interest. (FAC ¶ 31.)

Both parties in the Chancery Court sought reconsideration of the court's decision. With the exception of a modified calculation under section 8(a), the court affirmed its decision. *See Metromedia II*, 2009 WL 1509182. The Delaware Supreme Court affirmed this decision on November 2, 2009. *See In re Appraisal of Metromedia Int'l Group, Inc.*, C.A. No. 3352 (Del. Nov. 2, 2009).

---

[3] The court had originally applied a different analysis in determining the amount of shares section 8(a) awarded each shareholder. *See Metromedia I*, 971 A.2d at 902 & n.23. The court modified this decision in *Metromedia II*, *see* 2009 WL 1509182, at *2, but the change is immaterial to the allegations of malpractice or the calculation of damages in this suit.

5

B.  Procedural History

MIG filed this action on June 18, 2009, at which time it was assigned to the Honorable Naomi Reice Buchwald, District Judge.  On June 29, 2009 the case was reassigned to the Honorable Gerard E. Lynch, then a District Judge on this Court.  On July 10, 2009, Plaintiff filed the First Amended Complaint.  On August 17, 2009, Defendant filed its motion to dismiss.[4]  On October 1, 2009, upon the elevation of Judge Lynch to the Second Circuit, the case was reassigned to my docket.  The Court heard argument on the motion on December 22, 2009.  On March 3, 2010, the Court held a phone conference and ordered Defendant to submit a supplemental affidavit establishing the domicile of its American partners located abroad.  That affidavit was submitted on March 17, 2010.

II.  DISCUSSION[5]

A.  Jurisdiction

Jurisdiction is proper because there is complete diversity between the parties and the amount in controversy exceeds $75,000 (FAC ¶¶ 7-9).  *See* 28 U.S.C. § 1332.[6]

B.  Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), this Court must accept all well-pled allegations contained in the complaint as true and it must draw all reasonable inferences in favor of the plaintiff.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).  A plaintiff need not include "heightened fact pleading of specifics" to survive a Rule 12(b)(6) motion, *id.* at 570, but the "[f]actual allegations must be enough to raise a right of relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true," *id.* at 555 (citation omitted).  Therefore, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

Ultimately, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

---

[4] In the alternative, Defendant moved to stay this action while appealing the Chancery Court's decision.  Because the Delaware Supreme Court has resolved the pending appeal, Defendant has expressed a preference that the Court *not* stay this action.  (*See* Oral Arg. Transcript, 27:24-28:2, Dec. 22, 2009.)  Accordingly, the Court deems the request for a stay to be withdrawn.

[5] The Court will consider various exhibits attached by either party that were incorporated by reference into the Complaint.  Plaintiff's submissions are contained in the Declaration of Nehemiah S. Glanc, filed October 14, 2009 (Glanc Decl.).  Defendant's exhibits are contained in the Declaration of Paul C. Gluckow, dated August 17, 2009 (Gluckow Supp.), and the Reply Declaration of Paul C. Gluckow, filed November 13, 2009 (Gluckow Reply).

[6] For the purposes of establishing the domicile of a partnership, or a limited liability partnership like Defendant, the partnership is deemed to have the domicile of each of its partners.  *See Herrick Co., Inc. v. SCS Commc'n*, 251 F.3d 315, 322 (2d Cir. 2001).  This rule can create a jurisdictional problem for partnerships with partners working abroad.  "United States citizens domiciled abroad are neither citizens of any state of the United States nor citizens or subjects of a foreign state," such that "§ 1332(a) does not provide that the courts have jurisdiction over a suit to which such persons are parties."  *Id.* Nevertheless, because Defendant has established that each of its partners located abroad remains domiciled in the United States (*see* Decl. of Gerard Harper, Mar. 17, 2010), the Court finds that there is complete diversity between the parties.

6

inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. In contrast, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555) (citations omitted). Thus, if a plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

C.  Count 1:  The Drafting Malpractice

Plaintiff's first cause of action alleges that PW committed malpractice when it included language in the COD that led to the "double-dip." (FAC ¶ 47.) For the reasons set forth below, the Court finds that this claim is time barred.[7]

1.  Applicable Law

New York's statute of limitations for legal malpractice is three years. *See* N.Y. C.P.L.R. § 214(6). The claim accrues when the malpractice is committed. *Shumsky v. Eisenstein*, 96 N.Y.2d 164, 166 (2001). Accordingly, the three years begins to run "when all the facts necessary to the cause of action have occurred and an injured party can obtain relief in court." *Williamson ex rel. Lipper Convertibles, L.P. v. PricewaterhouseCoopers LLP*, 9 N.Y.3d 1, 8 (2007) (quotation omitted); *accord McCoy v. Feinman*, 99 N.Y.2d 295, 301 (2002). "In most cases, this accrual time is measured from the day an actionable injury occurs, even if the aggrieved party is then ignorant of the wrong or injury." *McCoy*, 99 N.Y.2d at 301 (quotation omitted).

New York does, however, recognize a limited exception to the three-year bar. The continuing representation doctrine "'recognizes that a person seeking professional assistance has a right to repose confidence in the professional's ability and good faith, and realistically cannot be expected to question and assess the techniques employed or manner in which the services are rendered.'" *Shumsky*, 96 N.Y.2d at 167 (quoting *Greene v. Greene*, 56 N.Y.2d 86, 94 (1992)). In such cases, the three-year statute of limitations will not begin to run until the representation ends. *See Glamm v. Allen*, 57 N.Y.2d 87, 94 (1982).

The continuing representation doctrine is an exception, however, and not the rule. "Application of the [continuing representation doctrine is] . . . generally limited to the course of representation concerning a specific legal matter," *Shumsky*, 96 N.Y.2d at 168, and courts must determine "'whether there has been continuous treatment, and not merely a continuing relation'" between the attorney and client. *Id.* at 168 (quoting *McDermott v. Torre*, 56 N.Y.2d 399, 405 (1982)) (borrowing rationale from medical malpractice cases). Thus, "the doctrine is not applicable to a client's or patient's continuing general relationship with a lawyer or physician involving only routine contact for miscellaneous legal representation or medical care, unrelated to the matter upon which the allegations of malpractice are predicated." *Id.*; *accord Williamson ex rel. Lipper Convertibles, L.P*, 9 N.Y.3d at 9 ("The [continuing

---

[7] It is proper for a district court to consider such a defense on a 12(b)(6) motion. *See Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.").

representation doctrine] does not apply to a continuing general relationship between patient and physician or to situations where the patient initiates routine, periodic examinations to check a condition."). Rather, the continuing representation doctrine is only applicable "where the continuous representation pertains specifically to the matter in which the attorney committed the alleged malpractice." *Id.*; *cf. W. Vill. Assocs. Ltd. P'ship v. Balber Pickard Battistoni Maldonado & Ver Dun Tuin, PC*, 854 N.Y.S.2d 340, 341 (1st Dep't 2008) ("The pleading must assert more than simply an extended general relationship between the professional and client, and the facts are required to demonstrate continued representation in the specific matter directly under dispute.")

2. Analysis

The alleged drafting malpractice occurred in September 1997, the date when the COD was filed. (*See* FAC ¶ 2.) Clearly, the cause of action accrued at the same time. Absent the continuing representation doctrine, then, the claim would have expired in September of 2000. Accordingly, the Court must determine whether there was "a mutual understanding of the need for further representation on the specific subject matter underlying the malpractice claim." *McCoy*, 99 N.Y.2d at 306. Of course, a plaintiff cannot simply make conclusory allegations that such an understanding existed, but must plead facts that support such an understanding. *See W. Vill. Assocs.*, 854 N.Y.S.2d at 341 ("[F]acts are required to demonstrate continued representation in the specific matter directly under dispute."); *cf. Iqbal*, 129 S. Ct. at 1949. Therefore, the Court must evaluate the specific allegations in the Complaint that support Plaintiff's conclusion.

Plaintiff offers two theories of how the continuing representation doctrine tolls the statute of limitations until 2007. First, Plaintiff argues that it has alleged specific representations related to the COD in each year from 1997 through 2007. (Pl.'s Opp. 11-18.) In the alternative, Plaintiff argues that it need not describe specific instances of continuing representation each year because the parties' "mutual understanding" suffices to toll the statute of limitations. Neither of these arguments is persuasive.

a. Continuing Representations

Plaintiff first argues that specific work done by PW for MIG each year from 1997 through 2007, mostly in the form of SEC filings, is sufficient to satisfy the continuing representation doctrine. Thus, Plaintiff alleges that after the COD was filed in 1997, "PW consistently monitored the COD . . . [and] represented MIG in connection with each and every development concerning the COD through March, 2008." (FAC ¶ 19.)

To support this claim, MIG alleges that "PW advised, reviewed, commented, edited and wrote MIG's 10Ks, 10KAs, 10Qs, 10QAs and other SEC filings that concerned both the Preferred Stock and the COD." (*Id.* ¶ 20.) For example, in 1998, PW prepared MIG's 10K for 1997, which "recites that the sum of 199.4 million dollars was raised by the preferred stock public offering." (*Id.* ¶ 21.) In addition, the 1997 10K provides, *inter alia*, a summary of the Company's outstanding equity, including the amount of preferred shares and their principal rights. (Glanc Decl. Ex. 15 (Form 10K filed by Metromedia International Group, Inc. on March 31, 1998) at F-37.) The 10K did not, however, address the Preferred Holders' conversion rights under section 8 — the provision containing the alleged malpractice. (*Id.*)

Plaintiff's memorandum also argues that a 1999 bond offering in connection with a merger is further evidence of a continuing representation with respect to the 1997 COD. (Pl.'s Opp. 15-16.) Plaintiff contends that PW's opinion letter in that offering, incorporated into the Registration Statements of those notes (Form S-4s), brings this representation within the continuing representation doctrine. (FAC ¶ 21.) In the opinion letter, PW states that, "[i]n connection with this opinion . . . we have examined . . . those corporate records of the Company as we have considered appropriate, including copies of its Amended and Restated Certificate of Incorporation." (*See* Gluckow Supp. Ex. D (Form S-4, filed by Metromedia International Group, Inc. on Aug. 31, 1999) & Ex. E (Form S-4/A, filed by Metromedia International Group, Inc. on Sept. 24, 1999).) Plaintiff concludes that, because the COD "amends" the Certificate of Incorporation, "Defendant flatly admitted it 'examined' the COD in connection with the merger." (Pl.'s Opp. 15-16.) Similarly, Plaintiff alleges that PW analyzed the effects of the new issue on the Preferred Stock: "a 10K405 filing states that the indenture for the senior discount notes limits the ability of MIG and certain of its subsidiaries to, among other things, incur additional indebtedness or issue capital or preferred stock." (FAC ¶ 21.)[8]

Plaintiff's memorandum also cites a Form S-4/A filed by MIG on September 2, 1999 relating to the 1999 bond issue as "a clear instance of Defendant's representation related . . . to the specific malpractice within the limitations period." (Pl.'s Opp. 14-15 (internal citations omitted).) The material that Plaintiff has highlighted, however — a single paragraph in MIG's Form S-4/A — states only that the concentration of MIG's common shares in the hands of its primary shareholder may have the effect of "delaying, deferring or preventing a change of control" of MIG. (Glanc. Dec. Ex. 6 at 18.)

The Complaint similarly alleges that "[t]he 10K for 1998 also references the rights of the Preferred Stockholders." (FAC ¶ 21.) Once again, however, the excerpts of the 1998 10K submitted by Plaintiff make only brief mention of the Preferred Shares, such as references to the Preferred Stock in the Company's consolidated financial statements. (Glanc Decl. Ex. 28 (Form 10K, filed by Metromedia International Group, Inc. on March 31, 1999) at S-1, S-2, Ex. 11 (in original SEC filing).) The 10K also makes oblique references to the Preferred Stock, such as to the inclusion of dividends in computing earnings (*id.* at 29), the fact that Preferred Stock was a source of financing (*id.* at 65-66), and the fact that the Preferred Stock may, at the company's discretion, constitute a restraint on liquidity (*id.* at 56). Finally, the 1998 10K contained the same brief paragraph about the rights of the Preferred Holders that was contained in the 1997 10K. (*Id.* at F-37.)

Plaintiff also argues that the "10-Qs and 10Q/A in particular reflect, *inter alia*, the requirement of a dividend payment, the payment source for such dividends, and that Plaintiff had the discretion to pay such dividends." (Pl.'s Opp. 17.) Similar to paragraphs contained in the Company's 10Ks, the 10Q for the first quarter of 1999 provides that

---

[8] The Complaint does not describe when this 10K405 was filed, and no such documents were included as Exhibits. A similar opinion, that the new indentures would limit the Company's ability to issue new preferred stock, is found in MIG's May 26, 1999 S-4. (*See* Glanc Decl. Ex. 19 (Form S-4, filed by Metromedia International Group, Inc. on May 26, 1999) at 45.)

9

> [t]he Company, at its discretion, can make dividend payments on its 7 1/4% Cumulative Convertible Preferred Stock . . . in either cash or Common Stock.  If the Company elects to continue to pay the dividend in cash, the annual cash requirement will be $15.0 million.  During 1998, the Company paid its four quarterly dividends of the Preferred Stock in cash.  On March 15, 1999 the Company paid the quarterly dividend on the Preferred Stock in cash.

(Glanc. Decl. Ex. 23 (Form 10Q, filed by Metromedia International Group, Inc. on May 17, 1999) at 49.)  The 10Q for the second quarter of 1999 likewise provides, under the heading "Cash Flows from Financing Activities," that "[f]unds used in financing activities in 1998 were for the preferred stock dividend of $7.5 million."  (*Id.* Ex. 24 (Form 10Q, filed by Metromedia International Group, Inc. on August 16, 1999) at 77.)  The remaining 10Qs and 10QA contain similar representations.  (*See id.* Ex. 25 (Form 10Q, filed by Metromedia International Group, Inc. on November 15, 1999) at 68, 79, and 80; *id.* Ex. 26 (Form 10QA, filed by Metromedia International Group, Inc. on August 31, 1999) at 63.)

The Court need not look at the routine representations past the year 2000 because it is clear that Plaintiff has alleged little more than that PW acted as its outside corporate counsel in the years following the COD.  Routine SEC filings that acknowledge the existence of the Preferred Shares or the amount of capital that MIG raised are the legal equivalent of "situations where the patient initiates routine, periodic examinations to check a condition."  *See Williamson ex rel. Lipper Convertibles, L.P.*, 9 N.Y.3d at 9.  These oblique references are simply not continuing representations relating to the Preferred Shares.  Thus, the SEC filings put forth by MIG are insufficient to trigger the continuing representation doctrine.

Plaintiff's reliance on *Wainwright v. Matrix Asset Advisors, Inc.*, No. 05 Civ. 227 (DLC), 2004 WL 3418933 (S.D.N.Y. July 27, 2004), does not suggest otherwise.  In *Wainwright*, plaintiffs brought suit against a financial advisor for negligently "rolling over" a retirement plan and causing two eventual beneficiaries to lose money.  *Id.* at *1.  The court concluded that, although the original "rollover" had occurred outside the statute of limitations period, evidence existed that "*might* suggest that there was ongoing *management* of Wainright's retirement accounts, including oversight of transfers to beneficiaries."  *Id.* at *6 (emphasis added.)  In this case, however, Plaintiff's allegations merely show that, during the statute of limitations period, PW's routine corporate work referenced the Preferred Stock, and even then, only incidentally.  This is clearly not enough to constitute a continuing representation that would toll the statute of limitations.

b.  "Mutual Understanding"

Perhaps mindful of the routine nature of the representations between the parties following the issuance of the COD, Plaintiff alternatively argues that "[t]he COD provisions as well as the parties' mutual understanding contemplated and required ongoing and developing future events and legal services." (Pl.'s Opp. 6.)[9]  Although it

---

[9] The Complaint contains the following allegation of a "mutual understanding":

> The COD is and was an executory understanding containing future ramifications that tied-in to the future legal services of PW pertaining to the Preferred Stock, including but not limited to PW's

10

offers no additional allegations of representations relating to the COD during the three-year period following the share issuance, Plaintiff nevertheless contends that subsequent relations between the parties, specifically the 2004 Memorandum, are evidence of a "mutual understanding of the need for further representation on the specific subject matter underlying the malpractice claim." (Pl.'s Opp. at 7 (internal quotation marks omitted).) Plaintiff also cites PW's 2002 presentation to MIG's board of directors, the 2003 press release concerning the payment of dividends to Preferred Holders, and PW's work on the voting lock-up agreement and sale of MIG in 2005 through 2007 as manifestations of this "mutual understanding." (FAC ¶ 21.)

These post-2000 activities, however, do not give rise to an inference that, in 1997, PW and MIG had identified a legal problem or specific legal task that required continued legal services. Rather, they show only "intermittent representation," insufficient to satisfy the continuing representation doctrine. *See Byron Chem. Co. v. Groman*, 877 N.Y.S.2d 457, 459 (2d Dep't 2009). The case law is quite clear in this regard.

In *Byron*, for example, an attorney had drafted an employment agreement in 1993 that included an ambiguous bonus provision. *Id.* at 458. This ambiguity eventually led to a larger bonus for the employee than had been intended. *Id.* From 1993 until 2003, the defendant continued to act as corporate counsel to the plaintiff, including representations in 2003 relating to the bonus provision. *See Byron Chem. Co. v. Groman*, No. 1302-06, 2007 WL 4471366 (N.Y. Supr. Dec. 5, 2007). Despite the long relationship between the parties and the second related representation, the court concluded: "Accepting the facts alleged in the plaintiff's complaint as true, there was a nine-year lapse between the defendants' representation as to the employment agreements. The continuous representation doctrine does not contemplate such intermittent representation." *Byron*, 877 N.Y.S.2d at 459.

Similarly on point is *Maurice W. Pomfrey & Associates, Ltd. v. Hackock & EstaBrook, LLP*, 862 N.Y.S.2d 217 (4th Dep't 2008). There, the plaintiff alleged that the defendant attorney had drafted a defective employment agreement in 1994, provided general legal services to the company until 2004, and defended the company in connection with the employment agreement in 2000. *Id.* at 219. Notwithstanding these facts, the court dismissed the action as time barred, reasoning that the plaintiff "did not seek or obtain defendant's services *in connection with the employment agreement* until March 2000, more than three years after the statute of limitations was expired." *Id.* (emphasis added).

Finally, *Transport Workers Union of America Local 100 AFL-CIO v. Schwartz*, 821 N.Y.S.2d 53 (1st Dep't 2006), provides further support for the conclusion that the continuing representation doctrine does not apply. In that case, the plaintiff had, in 1985, retained the defendant real estate agent to help exchange its property for another parcel, after which the real estate agent acted as the exclusive leasing agent for the new parcel. *Id.* at 55. When the plaintiff brought suit in 2003 for constructive fraud and breach of fiduciary

---

involvement in and advice about MIG dividends, transfers and/or changes of control . . . . Both MIG and PW contemplated and were fully aware of the need for further representation by PW in connection with the COD.

(FAC ¶ 16.)

duty, the Appellate Division declined to apply the continuing representation doctrine, concluding that the subsequent representations in connection with the new property constituted "discrete and severable transactions." *Id* at 56.

The cases relied upon by MIG do not counsel a different result. Plaintiff contends that its claim is adequately supported by cases finding "a mutual understanding of the need for further representation." (Pl.'s Opp. 5-11 (*citing Shumsky*, 96 N.Y.2d at 169 and *Schlanger v. Flaton*, 631 N.Y.S.2d 293 (1st Dep't 1995)). Those cases, however, are entirely distinguishable. In *Shumsky*, for example, the Court of Appeals found that an attorney who had failed to file a timely lawsuit was still engaged in representing his client, for purposes of the continuing representation doctrine, even after he had let the statute of limitations in the underlying action pass. *Shumsky*, 96 N.Y.2d at 169-70. The court noted that even after the attorney had missed the filing deadline, the "plaintiffs were left with the reasonable impression that defendant was, in fact, actively addressing their legal needs." *Id.* at 169. Therefore, the court analogized the case to *McDermott v. Torre*, a medical malpractice case in which the plaintiff had, after the medical malpractice occurred, continued to seek treatment for pain related to the very condition giving rise to the malpractice claim. *See McDermott*, 56 N.Y.2d at 405; *see also Shumsky*, 96 N.Y.2d at 169-70.

Similarly, in *Schlanger v. Flaton*, the court applied the continuing representation doctrine to allow a client to seek rescission of a business agreement entered into with his attorney, where the attorney had failed to disclose potential conflicts of interest, advise his client to seek outside counsel, and adequately counsel him about potential problems in the organizational structure. *See Schlanger,* 631 N.Y.S.2d at 295-97. Because the attorney continuously "exploit[ed] his own client through a lack of disclosure and also pursu[ed] affirmative steps to benefit himself at the expense of that client," the court determined that the statute of limitations for malpractice, ostensibly committed when the business was formed, did not run until the representation procured by that malpractice, the business venture, had ended. *Id.* at 296-97.

Neither *Shumsky* nor *Schlanger* provide support for Plaintiff's first cause of action. Unlike *Shumsky*, there was no reasonable belief by Plaintiff that Defendant was continuing to press a claim or attempt to resolve an ongoing, identified legal problem. Nor did PW's malpractice result in a business relationship between the parties, such that the entire relationship was tainted by that malpractice, as was the situation in *Schlanger*. *See* 631 N.Y.S.2d at 295.

\* \* \*

Because Plaintiff has alleged only a continuing general relationship, and not a continuing representation specifically related to the Preferred Stock, the continuing representation doctrine is inapplicable. Accordingly, the Court finds the drafting malpractice claim to be time barred.

D.  Counts II-IV:  The 2004 Misconduct

In the second, third, and fourth causes of action, MIG alleges that PW committed malpractice, breach of fiduciary duty, and fraud in connection with the 2004 Memo. With regard to Plaintiff's malpractice claim, the Court concludes that it is barred by New York's borrowing statute. With regard to Plaintiff's claims for breach of fiduciary duty and fraud, the Court finds that these too

12

must be dismissed, as New York does not recognize a separate cause of action apart from Plaintiff's untimely malpractice claim.

1. The 2004 Malpractice Claim is Untimely

"Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations." *Stuart v. Am. Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998). "When a non-resident sues on a cause of action accruing outside New York, CPLR 202 requires the cause of action to be timely under the limitation periods of *both* New York and the jurisdiction where the cause of action accrued." *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 528 (1999) (emphasis added) (citing N.Y. C.P.L.R. § 202). When the injury suffered by the plaintiff is primarily economic in nature, the action normally accrues where the plaintiff resides. *See id.* at 529; *Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 374-75 (S.D.N.Y. 2004).[10] Accordingly, Plaintiff must show that its malpractice claim is timely in New York *and* in North Carolina, the state where MIG resides. Because the Court finds that the claim is untimely under North Carolina law, it need not address whether it is timely under New York law.[11]

North Carolina's statute of limitations, like New York's, imposes a three-year bar on legal malpractice claims. *See* N.C. Gen. Stat. § 1-15(c). Unlike New York's, however, North Carolina's statute of limitations contains a built-in tolling period for "damage not readily apparent to the claimant at the time of its origin." *Id.* In such cases, the "suit must be commenced within one year from the date discovery is made." *Id.* The statute provides, however, that "in no event shall an action be commenced more than four years from the last act of the defendant giving rise to the cause of action." *Id.* This latter provision, the statute of repose, creates a condition precedent to the bringing of suit, rather than an affirmative defense:

> Unlike a limitation provision which merely makes a claim unenforceable, a condition precedent establishes a time period in which suit must be brought in order for a cause of action to be recognized. If the action is not brought within the specific period, the plaintiff "literally has *no* cause of action. The harm that has been done is *damnum absque injuria* — a wrong for which the law affords no redress."

*Hargett v. Holland*, 337 N.C. 651, 655 (1994) (quoting *Rosenberg v. Town of North Bergen*, 61 N.J. 190, 199 (1972)). Therefore, "[r]egardless of when plaintiff's claim might have accrued, or when plaintiffs might have discovered their injury, because of the four-year statute of repose, their claim is not maintainable unless it was brought

---

[10] The place where an injury "accrues" for purposes of the borrowing statue is a separate inquiry, distinct from the issue of what law should apply for choice of law purposes. *See Global Fin. Corp.*, 93 N.Y.2d at 528-29.

[11] The borrowing statue is inapplicable to Plaintiff's claims stemming from the drafting malpractice because, at the time that claim accrued, Plaintiff was a resident of New Jersey. (*See* Gluckow Decl. Ex. G (Form S-3 filed by Metromedia International Group, Inc. on September 10, 1997).) MIG moved to North Carolina some time prior to 2004. *See* Form 10K/A filed by Metromedia International Group, Inc. on February 24, 2004. Since New Jersey's applicable statute of limitations is longer, New York's borrowing statute will not look to it. *See* N.J. Stat.

Ann. § 2A:14-1; *McGrogan v. Till*, 167 N.J. 414, 419 (2001); *see also* N.Y. C.P.L.R. § 202 (directing a court to apply the *shorter* of the limitations period between either the state where the cause of action accrued or New York).

13

within four years of the last act of defendant giving rise to the claim." *Id.*

North Carolina does not recognize the continuing representation doctrine. In *Fender v. Deaton*, 153 N.C. App. 187 (N.C. App. 2002), a North Carolina appellate court faced an almost identical situation as that presented in *Shumsky*. In *Fender*, an attorney had, without his client's knowledge or consent, dismissed the lawsuit he had filed on his client's behalf and failed to refile it within one year, thus leaving his client without a means to recovery. *Id.* at 189. Even though the client reasonably believed the action to be ongoing, just as in *Shumsky*, the Court concluded that the last act had occurred when the lawyer failed to timely refile his client's lawsuit, not on the date the client learned of his attorney's failures. *Id.* The court explicitly rejected the continuing representation doctrine, finding that the it "has never been applied by our Courts in the context of a legal malpractice action." *Id.* at 189 n.1; *see also Carlisle v. Keith*, 169 N.C. App. 674, 684 (N.C. App. 2005) (explicitly rejecting any continuing representation doctrine under North Carolina law).[12]

Based on this clear authority, the Court concludes that North Carolina has *not* extended the continuing representation doctrine to legal malpractice claims. Accordingly, Plaintiff's claims regarding the 2004 malpractice are time barred.

### 2.  Plaintiff Has Failed to Plead Breach of Fiduciary Duty

Plaintiff's third cause of action seeks damages for breach of fiduciary duty, alleging that PW failed "to disclose its negligent draftsmanship to MIG" and "concealed its negligence." (FAC ¶¶ 60, 62.) The Court will apply New York law to Plaintiff's breach of fiduciary duty and fraud claims because both "parties' briefs assume that New York law controls this issue, and such implied consent is sufficient to establish choice of law." *Motorola Credit Corp. v. Uzan*, 388 F.3d 39, 61 (2d Cir. 1989) (internal citations and modifications omitted).

"New York law holds that, where a breach of contract or breach of fiduciary duty claim is premised on the same facts and seeks relief identical to that sought in a legal malpractice cause of action, such claims are redundant and should be dismissed." *Alaimo v. Cohen*, No. 07 Civ. 7625 (KMK), 2008 WL 4202267, at *3 (S.D.N.Y. Sep. 10, 2008) (quotation and internal citation omitted).

Plaintiff's breach of fiduciary duty claim seeks the same damages as all of Plaintiff's other claims, $140 million. (*See* FAC at 26-27.) Although Plaintiff argues that "the breach of fiduciary duty claim derives from PW's breach of other duties PW owed to MIG, *viz.* the duties of loyalty and honesty" and "is a separate and independent claim from the malpractice claims whose basis derives from a breach of the duty of care"

---

[12] Plaintiff relies on *MCNC v. Aon Consulting, Inc.*, No. 05 Civ. 00194, 2006 WL 3733267 (M.D.N.C. Dec. 14, 2006), for the proposition that North Carolina recognizes the continuing representation doctrine. (*See* Pl.'s Opp. 19.)  Although the Magistrate Judge in *MCNC* did, in dictum, indicate that the continuing representation doctrine exists under North Carolina law, he did so by relying on *Hargett*, which does not support this conclusion. *See id.* at *7. Moreover, cases decided by the North Carolina Court of Appeals after *Hargett* confirm that the continuing representation doctrine has no place in North Carolina law outside of the medical malpractice context. *See, e.g.*, *Carlisle*, 169 N.C. App. at 683-84 (reciting the "evolution" of the continuing representation doctrine and concluding that it does not apply to legal malpractice cases).

(*Id.* at 24 n.22), this is insufficient to salvage Plaintiff's claims.[13]  "Contrary to plaintiff[']s assumption, it is not the theory behind a claim that determines whether it is duplicative." *Nevelson v. Carro, Spanbock, Kaster & Cuiffo*, 736 N.Y.S.2d 668, 670 (1st Dep't 2002). Because Plaintiff's breach of fiduciary duty claim is premised on the same conduct and seeks the same relief as its 2004 malpractice claim, it is barred under New York law. *See Alaimo*, 2008 WL 4202267, *3. Accordingly, Plaintiff's claim for breach of fiduciary duty is dismissed.

### 3. Plaintiff Has Failed to Adequately Plead Fraud

Plaintiff's fourth cause of action — for fraud — asserts that the 2004 Memo "misrepresented to MIG . . . that the PW Mistakes were a mere 'inconsistency' or an 'ambiguity.'" (FAC ¶ 65.)  Thus, MIG alleges that "all such PW acts and omissions were intended to mislead MIG and deter MIG from instituting a malpractice lawsuit," as well as to "induce MIG to continue to retain PW as MIG's counsel." (*Id.* at 65-67.)  Further, MIG asserts that it "believed . . . that such PW Mistakes were not PW's fault as PW was deceptive and disingenuous in the matter, style, and intent in crafting the Memo and acting otherwise orally and in writing vis-à-vis MIG."[14] As a result, Plaintiff seeks damages in excess of $140 million and exemplary damages of $20 million. (*Id.* at 68.)

Like its breach of fiduciary duty claim, Plaintiff's fraud claim is duplicative and is not recognized under New York law:

> Where . . . a fraud claim is asserted in connection with charges of professional malpractice, it is sustainable only to the extent that it is premised upon one or more affirmative, intentional misrepresentations — that is, something more egregious than mere concealment or failure to disclose one's own malpractice.

*White of Lake George Inc. v. Bell*, 674 N.Y.S.2d 162, 163 (3d Dep't 1998) (quotation and alterations omitted); *accord Kaiser v. Van Houten*, 785 N.Y.S.2d 569, 572 (3d Dep't 2004) (holding that "'an attorney's failure to disclose malpractice does not give rise to a fraud claim separate from the customary malpractice action'" (quoting *Weiss v. Manfredi*, 83 N.Y.2d 974, 977 (1994))).

Plaintiff argues that it has adequately distinguished its fraud claim from the run of the mill concealment or failure to disclose claim. Plaintiff cites the New York Court of Appeals' ruling in *Simcuski v. Saeli*, 44 N.Y.2d 442 (1978), as support for its proposition. In *Simcuski*, a physician had negligently injured a spinal nerve of a

---

[13] Plaintiff also seeks punitive damages under its breach of fiduciary duty claim and thus argues that its breach of fiduciary duty claim seeks distinct damages. This tactic is insufficient to avoid application of the bar on duplicative claims and would in fact render it meaningless. *See Waggoner v. Caruso*, 873 N.Y.S.2d 238 (N.Y. Supr. Sept. 10, 2008) (Table decision). In any event, Plaintiff seeks the same punitive damages under its malpractice claim. (*See* FAC 26-27).

[14] To the extent that the fraud allegations rest upon PW's "acting otherwise orally and in writing," such allegations are insufficient to survive a motion to dismiss. "In order to satisfy Rule 9(b), the plaintiff must: '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 332 (S.D.N.Y. 2009) (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)). Any generalized allegations of fraud outside of the 2004 Memo fail to meet this standard.

15

patient during surgery. *Id.* at 447. After the surgery, the patient complained of numbness and pain. *Id.* Fully aware that his negligence during the operation was the cause of his patient's injuries, the defendant physician informed his patient that the injuries were "transient and that they would disappear if she would continue a regimen of physiotherapy which he had prescribed." *Id.* The court concluded that, "without more, concealment by a physician or failure to disclose his own malpractice does not give rise to a cause of action in fraud or deceit separate and different from the customary malpractice action, thereby entitling the plaintiff to bring his action within the longer period limited by such claims." *Id.* at 452. Nevertheless, because the physician (1) knew of the malpractice that caused plaintiff's injury, and (2) knowingly made false, material, and factual misrepresentations to the patient "with respect to the subject matter of the malpractice and the therapy appropriate to its cure," the court found that the plaintiff had set forth a distinct cause of action for fraud. *Id.* at 453.

The 2004 Memo does not fit the facts of *Simcuski* because Plaintiff has failed to allege that the Memo contained any false or misleading statements. *See Rand v. Starter Corp.*, No. 94 CIV. 5325 (DC), 1995 WL 322024, at *4 (S.D.N.Y. May 30, 1995) ("Plaintiff's theory supports only the conclusion that [defendant's] prediction was wrong, or that its choice of words was insufficiently precise for plaintiff's liking, neither of which present[s] a strong inference of fraud."). Indeed, when read in full, the memorandum clearly sets forth the potential problem created by the language in section 8(b) and concludes that

> there is a risk that a court could strictly construe the text of the Certificate of Designations and, based solely on a reading of what is contained in the "four corners" of the document, find that a holder of Preferred Stock that elects to convert his Preferred Stock is entitled to be paid twice for the accrued but unpaid dividends on the Preferred Stock so converted.

(2004 Memo.) Although Plaintiff's argument picks and chooses language from the Memo to support an inference of fraudulent intent, the memo only concludes that the "better reading" of the COD is a reading consistent with the parties' intent and industry practices — a reading that does not contain the "double-dip." (*Id.*) In fact, the document indicates exactly why a court might side with the Preferred Holders: namely, because the court may only look within the four corners of the document. (*Id.*)

Since Plaintiff has failed to plead with particularity any false or misleading statement made by Defendant, Plaintiff's fraud claim must be dismissed.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is granted in its entirety. The Clerk of the Court is respectfully directed to terminate the motion located at docket number 11 and to close this case.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: March 29, 2010
       New York, New York

USDS SDNY
DOCUMENT
ELECTRONICALLY FIL
DOC #: _____
DATE FILED: 3/29/10

\* \* \*

Plaintiff is represented by Aaron Richard Golub, Mark Moody, and Nehemiah Glanc, Aaron Richard Golub, Esquire, PC, 42 East 64th Street, New York, NY 10021. Defendant is represented by Bruce Angiolillo, Paul Gluckow, and Summer Craig, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017.